## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SOPHOS INC., | |
| Plaintiff, | Civil Action No. 13-cv-12856-DJC |
| vs. | |
| RPOST HOLDINGS, INC., RPOST COMMUNICATIONS LIMITED, | JURY TRIAL DEMANDED |
| Defendants. | |
| | Civil Action No. 14-cv-13628-DJC |
| RPOST HOLDINGS, INC. and RPOST COMMUNICATIONS LIMITED, | |
| Plaintiffs, | |
| v. | JURY TRIAL DEMANDED |
| SOPHOS INC., | |
| Defendant. | |

## SOPHOS INC.'S OPENING CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

Page

I.    INTRODUCTION.................................................................................................... 1

II.   FACTS .................................................................................................................... 1

      A.    The Patented Technology Is Computerized "Snail Mail"................................ 1

      B.    Representative Claims. ................................................................................... 2

      C.    How Email Works. ......................................................................................... 3

III.  APPLICABLE LAW ............................................................................................... 4

IV.   THE ASSERTED CLAIMS OF THE '628 PATENT ARE INDEFINITE ............... 5

      A.    Patent Claims Must Be Defined With "Reasonable Certainty". ..................... 5

      B.    The Term "Special Processing" Is Indefinite. ................................................ 6

            1.    "Special Processing" Is Not Objectively Defined In The
                  Claims........................................................................................... 7

            2.    The Other Intrinsic Evidence Provides No Objective Guidance
                  To Understand What Qualifies As "Special" Processing. ................... 8

V.    THE COURT SHOULD ADOPT SOPHOS'S PROPOSED
      CONSTRUCTIONS OF THE REMAINING TERMS ........................................... 10

      A.    The "Dialog" Terms ('389, '199 and '913 Patents). ....................................... 10

            1.    "mail transport protocol dialog" ('389 patent). ................................. 10

                  a.    The Patentee Defined "Dialog" During Prosecution. ............. 10

                  b.    The Other Intrinsic Evidence Confirms A "Dialog" Is A
                        Conversation................................................................................ 12

                  c.    The Eastern District Of Texas's Previous Construction
                        Of This Term Is Incorrect. ......................................................... 13

            2.    "data transport protocol dialog" ('199 patent). ................................. 14

            3.    "protocol dialog" ('913 Patent)........................................................... 15

            4.    "portions of…dialog…in which the receiving Mail Transport
                  Agent accepts or declines delivery of the transmitted message"
                  ('913 patent).................................................................................... 16

      B.    The "First Information" Terms ('389 and '199 Patents). .............................. 17

**TABLE OF CONTENTS**
(continued)

Page

C.      "transmitting…the first information to the sender" ('389 patent). .............. 19

D.      "first route" / "second route different from the first route" ('628 patent). ............................................................................................... 20

1.      The Claims Define "First Route" and "Second Route" As Different Network Paths.......................................................................... 21

2.      The Other Intrinsic Evidence Confirms That These "Route[s]" Are Different Network Paths. ............................................................... 22

E.      "Mail Transport Agent" ('913 Patent)............................................... 23

VI.      CONCLUSION ....................................................................................... 25

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
    134 S. Ct. 2347 (2014) ..................................................................................................1

*Callicrate v. Wadsworth Mfg., Inc.*,
    427 F.3d 1361 (Fed. Cir. 2005) ...................................................................................13

*CCS Fitness, Inc. v. Brunswick Corp.*,
    288 F.3d 1359 (Fed. Cir. 2002) .....................................................................................5

*Datamize, LLC v. Plumtree Software, Inc.*,
    417 F.3d 1342 (Fed. Cir. 2005) ..................................................................................5, 7

*Halliburton Energy Servs., Inc. v. M-I, LLC*,
    514 F.3d 1244 (Fed. Cir. 2008) ..................................................................................6, 7

*Interval Licensing LLC v. AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014) ...........................................................................6, 7, 8, 9

*Markman v. Westview Instruments, Inc.*,
    517 U.S. 370 (1996) ......................................................................................................4

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014) .........................................................................................5, 6, 9, 10

*Ormco Corp. v. Align Tech., Inc.*,
    498 F.3d 1307 (Fed. Cir. 2007) ...................................................................................10

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ............................................................. passim

*Standard Oil Co. v. American Cyanamid Co.*,
    774 F.2d 448 (Fed. Cir. 1985) .....................................................................................20

*Transco Prods. v. Performance Contracting, Inc.*,
    38 F.3d 551 (Fed. Cir. 1994) (Rich, J.) .........................................................................2

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) .......................................................................................5

**STATUTES**

35 U.S.C. § 101 ..................................................................................................................1

35 U.S.C. § 112(b) ...........................................................................................................4, 5

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

**OTHER AUTHORITIES**

MANUAL OF PATENT EXAMINING PROCEDURE, § 201.7....................................................2

Sophos Inc. respectfully submits this opening claim construction brief to address Sophos's proposed constructions for the disputed claim terms of U.S. Patent Nos. 8,504,628, 8,224,913, 8,209,389 and 8,468,199 (collectively the "RPost patents").

## I.     INTRODUCTION

As the Court is aware, Sophos has filed a motion for judgment on the pleadings that all asserted claims of the RPost patents are directed to non-patentable subject matter and are therefore invalid under 35 U.S.C. § 101 and *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014).[1]  If granted, that motion will be dispositive of this case and will therefore moot the need for claim construction.

Even if the Court does reach claim construction, more than half of the asserted claims are invalid because the term "special processing" is indefinite.  "Special processing" is a subjective term that has no commonly accepted meaning to one of ordinary skill in the art and provides no objective guidance on its scope.  Thus, a person of ordinary skill cannot attribute any objective meaning to that term with reasonable certainty.  The claims that contain the term "special processing" are therefore indefinite and require no further construction.

For the remaining disputed claim terms, Sophos's proposed constructions are consistent with the intrinsic record and attribute the meaning to those terms that a person of ordinary skill in the art would understand them to have.  Sophos's proposed constructions also are readily understandable to the jury, who will be applying these constructions.

_____

[1] *See* Dkt. No. 95 in Case No. 1:13-cv-12856 and Dkt. No. 71 in Case No. No. 14-cv-13628.

II.     **FACTS**

A.     **The Patented Technology Is Computerized "Snail Mail."**

The RPost patents computerize the well-known concept of certified "snail mail." According to the RPost patents, "[t]his invention relates generally to a system and method for verifying delivery and content of an electronic message and, more particularly, to a system and method of later providing proof regarding the delivery and content of an e-mail message." Dkt. No. 1-2, '628 patent, 1:20-24. The RPost patents explain that although email had replaced "snail mail" for many business practices because it was "faster, cheaper and generally more reliable," there were "some mail applications where hard copy [was] still dominant, such as registered and certified mail." *See id.*, 1:26-30. Thus, according to the RPost patents, there existed "a need for an e-mail system and/or method that can provide reliable proof of the content and delivery of an e-mail message in order to take fuller advantage of the convenience and low cost of communicating via e-mail." *Id.*, 2:15-19. "Ideally, the invention will give e-mail and other electronic messages a legal status on par with, if not superior to, that of registered United States mail." *Id.*, 3:6-12.

To computerize certified "snail mail," the RPost patents are directed to "an electronic message system that creates and records a digital signature of each electronic message sent through the system." *Id.*, 3:16-18. In this electronic system, an "originator" may send electronic messages to "recipients" and the "the system returns a receipt of delivery to the originator of the electronic message." *Id.*, 3:18-25. "The receipt includes, among other things: the original message. [sic] digital signature of the message, and a handshaking and delivery history including times of delivery to the recipients." *Id.*, 3:25-30.

**B.      Representative Claims.**

RPost contends that Sophos infringes claims 1-5, 7-19, 21-27 and 30 of the '628 patent, claims 1, 4, 5, 7 and 10-16 of the '389 patent, claims 1-3, 6 and 7 of the '199 patent, and claims 1 and 2 of the '913 patent.  Each of these patents is related and they share a nearly identical specification.  For example, the '199 patent is a continuation[2] of the '389 patent, which is a continuation of an application from which the '628 patent continues and to which the '913 patent claims priority.  Asserted claim 1 of the '628 patent is representative of the other asserted claims and recites:

> 1.      A method of transmitting a message from a sender to a recipient, comprising:
>
> adding a particular indication to a message to be sent to a recipient, the particular indication identifying the message as requiring special processing;
>
> transmitting the message to a server remote from the recipient;
>
> determining at the server whether the message has the particular indication before the message is transmitted from the server to the recipient;
>
> transmitting the message from the server to the recipient through a first route if the message lacks the particular indication; and
>
> processing the message by the server in accordance with the particular indication.

'628 patent, cl. 1.  The asserted claims of the '389 patent generally relate to transmitting an email and receiving an indication that the email was received by the recipient and generating a delivery receipt.  *See* Dkt. No. 1-4, '389 patent, cl. 1.  The asserted claims of the '199 patent are similar to

---

[2] A patent application that is a continuation is "for the same invention" and has the same disclosure as the application from it continues.  MANUAL OF PATENT EXAMINING PROCEDURE, § 201.7.  While "[a] continuation application claims the same invention claimed in an earlier application, … there may be some variation in the scope of the subject matter claimed."  *Transco Prods. v. Performance Contracting, Inc.,* 38 F.3d 551, 555 (Fed. Cir. 1994) (Rich, J.) (citing MPEP § 201.7).

those of the '389 patent, except they involve a delivery failure notification.  *See* Dkt. No. 1-5, '199 patent, cl. 1.  The asserted claims of the '913 patent also concern email transmission, but more specifically recite the protocols involved in such transmission.  *See* Dkt. No. 1-3, '913 patent, cl. 1.

### C.    How Email Works.

Internet Electronic Mail (email) was closely modeled on the postal mail system.  Expert Declaration of John C. Klensin, Ph.D. ("Klensin Decl."), ¶ 19.[3]  In fact, the architects of the earliest email systems contacted the U.S. Postal Service to be sure that computer-based "mail" did not violate postal regulations.  *Id.*  Like "snail mail" messages sent through the postal mail system, email messages include the information needed to transport and deliver the message.  *Id.*, ¶ 20.  This envelope information is known as "SMTP information," the Simple Mail Transfer Protocol.  *Id.*  Message envelope or SMTP information contains the information needed to accept a message into the Internet, transport it, and deliver it to a destination.  *Id.*

The SMTP specification is organized around a command-response dialog in which the message sender takes an action (after the very first step, sending a command) and then waits for a reply from the intended receiver.  *Id.*, ¶ 22.  SMTP operates between one pair of Internet hosts at a time (*id.*, ¶ 26), and senders normally cannot send a new command until a response is received (*id.*, ¶ 25).  Receivers cannot normally send a response except when a command has been received.  *Id.*  The most important part of the SMTP information is the delivery address (known as the forward-pointing address or "RCPT" command argument), the sender address

---

[3]  Dr. Klensin has been involved in the design of the Internet and specifically Internet applications for approximately 45 years.  Klensin Decl., ¶ 3.  He was the Internet Architecture Vice President at AT&T, the first Distinguished Engineering Fellow at MCI and Principal Research Scientist at MIT.  *Id.*  Dr. Klensin is a "Pioneer" level member of the Internet Hall of Fame and is responsible for developing Internet email architecture as we know it.  *Id.*, ¶ 15.

(known as the backward-pointing address or "MAIL" command argument—roughly equivalent to a return address on a postal envelope), and an announcement of the identity of the sending system.  *Id.*, ¶ 20.  The latter might be thought of as analogous to a postmark, albeit an undated one and with the understanding that the Postal Service does not generally record and publish information about each office or other facility through which a message passes.  *Id.*

## III.   APPLICABLE LAW

The patent statute requires that the claims of a patent "particularly point[] out and distinctly claim[] the subject matter which the inventor [] regards as the invention."  35 U.S.C. §112(b) (2012).  Courts construe the claims of a patent as a matter of law.  *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996).

"Claim interpretation begins with an examination of the intrinsic evidence, *i.e.*, the claims, the rest of the specification and, if in evidence, the prosecution history."  *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002).  While the words of a patent claim are important, they "are part of 'a fully integrated written instrument,' consisting principally of a specification that concludes with the claims.  For that reason, claims 'must be read in view of the specification of which they are a part.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (*en banc*).  The specification "is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

## IV.   THE ASSERTED CLAIMS OF THE '628 PATENT ARE INDEFINITE

RPost accuses Sophos of infringing 26 claims of the '628 patent, which comprise nearly 60 percent of all the claims asserted in this case.  As described above, these claims concern transmitting a message and for performing "special" processing on that message prior to transmission.  However, because the patent provides no guidance to one of ordinary skill as to

what processing is "special" and what processing is not "special," each of these claims is invalid as indefinite.

## A.      Patent Claims Must Be Defined With "Reasonable Certainty."

If a claim when viewed in light of the intrinsic evidence does not "inform those skilled in the art about the scope of the invention with reasonable certainty," then the claim fails the requirement of 35 U.S.C. 112(b) and is invalid as indefinite.  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014).  This "is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims."  *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005).  "Because claims delineate the patentee's right to exclude, the patent statute requires that the scope of the claims be sufficiently definite to inform the public of the bounds of the protected invention, *i.e.*, what subject matter is covered by the exclusive rights of the patent.  Otherwise, competitors cannot avoid infringement, defeating the public notice function of patent claims."  *Halliburton Energy Servs., Inc. v. M-I, LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008).

Though the definiteness standard does not require absolute precision, "a patent does not satisfy the definiteness requirement of § 112 merely because 'a court can ascribe *some* meaning to the patents claims.'"  *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370-71 (Fed. Cir. 2014) (emphasis in original) (citation omitted).  Rather, the claims "must provide objective boundaries for those of skill in the art."  *Id.*

## B.      The Term "Special Processing" Is Indefinite.

Each of the asserted claims of the '628 patent requires a "particular indication" in a message that identifies it as "requiring special processing."  *See* '628 patent, cls. 1, 14, 30.  Because the term "special processing" is not a term of art that is understood without reference to

the patent itself and is not defined in the patent, each of the "special processing" claims is invalid as indefinite.  *Nautilus*, 134 S. Ct. at 2129.

Importantly, the patentee has coined the term "special processing" in the claims of the '628 patent.  "Special processing" is not a term that has a commonly-accepted meaning to people of ordinary skill in the art of the patent.  Klensin Decl., ¶ 65.  To the contrary, the meaning of the phrase "special processing" is subjective—any processing could be "special" or "not special" depending on the circumstances.  Klensin Decl., ¶¶ 65-72.

To be valid, the patent must therefore define "special processing" in a manner that "provides objective boundaries for those of skill in the art."  *Interval*, 766 F.3d at 1370-71.  Indeed, the Federal Circuit has consistently held that claim terms meaning different things to different people are invalid as indefinite.  *E.g.*, *Interval*, 766 F.3d at 1370-71 (finding "unobtrusive display" indefinite); *Datamize LLC*, 417 F.3d at 1350 (finding "aesthetically pleasing" indefinite and concluding that "[i]n the absence of a workable objective standard," a claim that is "completely dependent on a person's subjective opinion" is indefinite); *Halliburton Energy Servs.*, 514 F.3d at 1251 (finding "fragile gel" indefinite because the specification did not define how "fragile" the gel needed to be to fall within the scope of the claim).

### 1. "Special Processing" Is Not Objectively Defined In The Claims.

The inquiry for an objective boundary for "special processing" begins with the claim language.  *Phillips*, 415 F.3d at 1312.  The claim language here, however, offers no way to understand the scope of the term with reasonable certainty.  Rather, independent claims 1, 14, and 30 of the '628 patent, where this term is used, recite that a "particular indication" identifies a message as requiring "special" processing.  '628 patent, cls. 1, 14, 30.  The claims' use of the word "special" differentiates "special" processing from processing that is not special.

This begs the question of what processing is "special."  Claims 8 and 23 provide a first clue.  Those claims recite that a "special process" is one that is "different than a normal process used by the server."  *Id.*, cl. 8, 23 ("special process … different than the normal process").  However, what is "normal" according to the patent is just as ambiguous as what is "special," because the patent does not use the term "normal process" outside of the claims and because what is "normal" to one person may not be "normal" to another.  Klensin Decl., ¶¶ 65-72.

Similarly, claims 4-7 and 18-21 provide, without limitation, only examples of what "special processing" may include.  These examples do not objectively define the term.  For instance, "special" processing potentially "includes encrypting the message to transmit [it] in a more private manner."  *Id.*, cl. 5, 19.  The other claims similarly explain what "special processing" may "include[]," but do not define what "special processing" is limited to and what it is not limited to.  *See Interval*, 766 F.3d at 1374 (dismissing a single, non-exclusive example of "unobtrusive display" as insufficient to render the term "display … in an unobtrusive manner" definite because "a skilled artisan is left to wonder what other forms of display are 'unobtrusive'").  Thus, after reading the claims, all one of ordinary skill can understand is that "special" processing is "different" than "normal" processing, and that "special" processing includes, without limitation, certain types of processing.  This does not satisfy the definiteness requirement.

> **2.      The Other Intrinsic Evidence Provides No Objective Guidance To Understand What Qualifies As "Special" Processing.**

The specification and the other intrinsic evidence also do not define "special processing."  Indeed, the term never appears in the specification.  The term's meaning is also never discussed in the prosecution history.  Furthermore, the patentee did not use the term "normal process" outside of the claims, so that term does not illuminate the meaning of "special processing."

The implication of this ambiguity is clear.  The term is indefinite because one of ordinary skill in the art cannot determine what processing qualifies as "special" with reasonable certainty. Klensin Decl., ¶¶ 65-72.  For example, consider the "snail mail" scenario where Alice mails a letter to Bob.  Before she deposits it in a mailbox, Alice marks the envelope as "Special Handling Required" because she thinks the Post Office will get it to Bob faster with that particular indication.  The postal carrier retrieves Alice's envelope from the mailbox and transmits it to the local post office, remote from Bob, for processing.  There, the post office sees that Alice has marked the envelope with the particular indication.  However, this marking means nothing to the Post Office, and so the Post Office processes Alice's letter in accordance with its indication, which is to say that the Post Office processes Alice's letter in the same manner it processes envelopes it receives that bear no indication.  In this way, what is "special" to Alice is not "special" to the Post Office.  *Id.*, ¶ 68.

For another example, consider an accused email appliance that performs encryption on all emails that are marked for encryption.  Accordingly, the appliance, in routine operation, encrypts marked emails and does not encrypt unmarked emails.  Is the encryption of emails, which results from the standard operation of the appliance, "special" processing?  To someone who has not marked their email as requiring encryption, the encryption is "special" and the lack of encryption is "normal."  To someone who has marked their email as requiring encryption, the encryption is "normal" and the lack of encryption is "special."  *Id.*, ¶ 70.

Where such ambiguity cannot be resolved with reference to the intrinsic evidence, it is fatal to the claim.  In *Interval*, the Federal Circuit held that "in an unobtrusive manner" was indefinite because it "is highly subjective" and the intrinsic evidence did not provide an "objective boundary" to its scope.  766 F.3d at 1371.  The asserted claims in *Interval* recited a

system and method for displaying content (*i.e.*, pop-up content) in an "unobtrusive manner that does not distract a user of the display device … from a primary interaction with the display device … ." *Id.* at 1368.  The Federal Circuit rejected the patentee's argument that the patentee had defined the term in the intrinsic evidence, and concluded that the absence of a "reasonably clear and exclusive definition" left "the facially subjective claim language without an objective boundary." *Id.* at 1372.

The same is true here.  The term "special processing" is subjective and boundless without objective guideposts to explain what is "special" about the processing.  Klensin Decl., ¶ 72. Section 112 requires the patentee to provide this guidance in the patent, but the '628 patent does not.  Each of the asserted claims reciting "special processing" is therefore invalid.  *Nautilus*, 134 S. Ct. at 2129.

## V.    THE COURT SHOULD ADOPT SOPHOS'S PROPOSED CONSTRUCTIONS OF THE REMAINING TERMS.

### A.    The "Dialog" Terms ('389, '199, and '913 Patents).

Three of the four RPost patents recite claims directed to a "dialog" that relates to the transmission of a message from a server to a recipient.  *See* Dkt. No. 1-4, '389 patent, cl. 1; Dkt. No. 1-5, '199 patent, cl. 1; Dkt. 1-3, '913 patent, cl. 1.  Sophos's proposed constructions for each of these terms is based on the patentee's own understanding of the term "dialog" and is consistent with the claim language and specifications.

#### 1.    "mail transport protocol dialog" ('389 patent).

| Claim Term | Sophos's Construction | RPost's Construction |
|---|---|---|
| "mail transport protocol dialog" | A conversation between a sender and a receiver consisting of commands and responses to transmit an e-mail message. | Mail transport data including a sequence of at least one command and at least one response |

Each of the asserted claims of the '389 patent recite a "mail transport protocol dialog" that is generated during transmission of the email from the server to the recipient.  '389 patent, cls. 1, 7, 14.  Sophos's construction respects the patentee's acknowledgement, in the prosecution history and in the specification, that this type of "dialog" is a conversation that uses a particular language to transmit an email.

### a.     The Patentee Defined "Dialog" During Prosecution.

The patentee defined the claim term "dialog" during the prosecution of the parent to the '389 patent, U.S. Patent No. 7,966,372, whose prosecution history is relevant to this inquiry. *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1314 (Fed. Cir. 2007).  The patentee stated that "[a] dialog, as that term is understood by one skilled in the relevant art, is a list of commands and responses exchanged between an outgoing server and a destination address or server to transmit a message."  Ex. 1, '372 Patent File History, 1/31/11 Amendment at 10.  This is persuasive evidence about the proper construction of this term.  *Phillips*, 415 F.3d at 1317 ("[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention ... .").

Other statements made by the patentee during prosecution of the '372 patent confirm that Sophos's construction is correct.  For example, the patentee described mail transport protocol dialog as "the commands and responses that are exchanged between the server and destination address as part of the mail transport process generated during transmission of the message between the server and destination address for subsequent proof of the message and the delivery of the message by the server to the destination address… ."  Ex. 1, '372 Patent File History, 5/13/10 Amendment at p. 9.  The patentee also distinguished the mail transfer protocol dialog from mere "[i]nformation [that] is passed back and forth between senders and recipients."  *Id.*

The patentee also provided an example SMTP dialog from the prior art "Network Design Manual," which establishes that a person of ordinary skill in the art would understand "dialog" to mean a conversation of commands and responses to transmit an email.  Ex. 1, '372 Patent File History, 5/13/10 Amendment, Appx. A at p. 2.  Shown below, this example from the Network Design Manual shows precisely the type of conversation between a sender computer and a receiver computer claimed by the '389 patent, and represented in Sophos's construction.  *Id.*

```
Here is a typical SMTP dialog between a client and an MTA:

MTA: 220 TEST.NWC.COM Simple Mail Transfer Service Ready

MUA: MAIL FROM:

MTA: 250 Sender OK

MUA: RCPT TO:

MTA: 250 Recipient OK

MUA: DATA
MUA: 354 Enter mail input; end with
.

MUA: This is a test message.
MUA: I will end this message with a period all by itself.
MUA: .
MTA: 250 OK

MUA: QUIT
MTA: 221 TEST.NWC.COM closing connection.
```

### b. The Other Intrinsic Evidence Confirms A "Dialog" Is A Conversation.

The '389 patent claims also support Sophos's construction.  The term "dialog" itself indicates that the claim term is directed to a conversation.  In addition, the claimed mail transport protocol dialog is a conversation of commands and responses that would only be generated during the transmission of emails.  *See* '389 patent, cl. 1 ("generated during transmission of the message from the server to the recipient"), cl. 7 ("generated by the electronic mail system during transmission of the message from the server to the recipient processor").  Thus, a "mail transport protocol dialog" is a conversation between a sender and a receiver consisting of commands and

responses to transmit an email message, and not commands and responses to transmit another message type.

Sophos's construction is also consistent with the specification, which describes the composition of a dialog for message transmission.  The specification states that "[t]ypically this dialogue will include protocol messages in which, among other things, the destination server identifies itself, grants permission to upload a message for a named recipient, and acknowledges that the message was received."  *Id.*, 12:65-13:4.  Furthermore, the specification states that:

> It is common practice for Internet emails to be relayed from MTA to MTA until they reach their final destination.  The primary purpose for requiring a direct connection between the RPost server and the destination's MTA is so that the RPost server can record delivery of the message, (this record taking the form of an SMTP dialogue) with the e-mail server which has proprietary responsibility for receiving e-mail for the recipient domain name.

*Id.*, 11:49-56; *see also id.*, 12:4-10.  Here again, the patentee confirmed that a "mail transport protocol dialog" is a conversation between a sender and a receiver consisting of commands and responses to transmit an email message.  In fact, people of ordinary skill in the art understand that SMTP operates with a strict command-response dialog, with each of the commands taking the form of a word-like command verb (e.g., "MAIL," "RCPT, or "DATA"), and each response starting with a three-digit numeric "response code" or "reply code."  Klensin Decl., ¶ 39. Sophos's construction of this term is thus consistent with the intrinsic and extrinsic evidence, which shows precisely the meaning that the patentee understood it to have.

### c.   The Eastern District Of Texas's Previous Construction Of This Term Is Incorrect.

Although this term has been previously construed by another court, the Court should not adopt the previous construction.  Judge Gilstrap, in *RMail Ltd. v. Amazon.com, Inc.*, No. 10-cv-258, (E.D. Tex. Mar. 11, 2013), construed "mail transport protocol dialog" to mean "data

including a list of at least one command and at least one response exchanged between devices during the transmission of a message." Ex. 2, Claim Construction Order (Dkt. No. 297), at 87. The *Amazon* construction is not correct for at least three reasons.

First, the *Amazon* construction ignores the claim's recitation that the "dialog" results from the transport of "mail," given that it is a "mail" transport protocol dialog. The *Amazon* construction broadens the term to include transportation of generic "message[s]," rather than limiting it to transportation of email, which the term itself requires through its use of the word "mail" to describe the "transport protocol dialog." A construction that reads out a limitation from a claim is not correct. *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1369 (Fed. Cir. 2005) (rejecting district court's construction that "reads out the 'preformed' limitation and thus transforms the limitation into simply an 'endless loop'").

Second, the *Amazon* construction ignores the fact that the claimed mail transport protocol dialog is a product of the message's transmission. Indeed, the construction reads like a possibility of what may be found in a "dialog" rather than what a "dialog" actually contains when a message is transmitted from a sender to a receiver. Similarly, the term includes the word "dialog," whose plain meaning is a "conversation" rather than as a "list" that is "exchanged."

Third, the *Amazon* court construed the term in the context of U.S. Patent No. 7,966,372, not the '389 patent asserted in this case. While the '372 patent and the '389 patent are related, there is at least one important difference—the description of "mail transport protocol dialog" recited in dependent claims 11, 13-15 of the '372 patent is not recited in the '389 patent. Those claims in the '372 patent "recite the mail transport protocol dialog including data other than commands and responses, such as receipt by the recipient and server identities." Ex. 2 at 84. Judge Gilstrap found these dependent claims to be important to his analysis. *Id.* at 85-86.

However, the '389 patent has no such dependent claims that define "mail transport protocol dialog."

Accordingly, Sophos's construction of "mail transport protocol dialog" is correct in view of the intrinsic evidence.

### 2.    "data transport protocol dialog" ('199 patent).

| Claim Term | Sophos's Construction | RPost's Construction |
|---|---|---|
| "data transport protocol dialog" | A conversation between a sender and a receiver consisting of commands and responses to transmit a message. | Transport data including a sequence of at least one command and at least one response |

The asserted claims of the '199 patent recite a "data transport protocol dialog."  *See* '199 patent, cl. 1.  This dialog is similar to the "mail transport protocol dialog" taught in the '389 patent claims except that it does not specifically concern the transport of email.  This difference compels a slightly different construction for "data transport protocol dialog."  Because the '199 patent is a continuation of the '389 patent and shares the same disclosure, the evidence from the specification and from the prosecution history is the same.  This includes the patentee's acknowledgement in the '372 patent file history that "[a] dialog, as that term is understood by one skilled in the relevant art, is a list of commands and responses exchanged between an outgoing server and a destination address or server to transmit a message."  Ex. 1, '372 Patent File History, 1/31/11 Amendment at 10.  Accordingly, Sophos's construction of "data transport protocol dialog" correctly accounts for the fact that this term is not limited to email.

3.      "protocol dialog" ('913 patent).

| Claim Term | Sophos's Construction | RPost's Construction |
|---|---|---|
| "protocol dialog" | A language of commands and responses used to transmit an e-mail message from a sender to a recipient. | Data including a sequence of at least one command and at least one response |

Both of the asserted claims of the '913 patent recite a "protocol dialog" to transmit an email that is "selected from a group consisting of … the SMTP and ESMTP protocols."  Dkt. No. 1-3, '913 patent, cl. 1.  Sophos's construction is consistent with the intrinsic evidence.

The claims recite that an email is transmitted by way of a "protocol dialog" that is "selected from a group consisting of … the SMTP and ESMTP protocols."  Thus, a "protocol dialog" can only be defined by one of the SMTP protocol or the ESMTP protocol.  The patent describes each of the SMTP and ESMTP protocols at length as languages of commands and responses used to transmit an email message from a sender to a recipient.  '913 patent, 26:60-65 ("SMTP is a protocol for sending e-mail messages between servers."), 4:27-28, 8:31-53, 11:18-23, 11:41-48, 11:63-12:65, 15:16-18, 24:60-25:12, 26:66-27:2.  The claims further state that the dialog is "between the server and the recipient in which the receiving Mail Transport Agent accepts or declines delivery of the transmitted message."  *Id.*, cl. 1.  This confirms that the claimed "protocol dialog" relates to transmitting an email message and not any other type of message.

Moreover, the prosecution history of the '372 application again confirms that "[a] dialog, as that term is understood by one skilled in the relevant art, is a list of commands and responses exchanged between an outgoing server and a destination address or server to transmit a message."  Ex. 1, '372 Patent File History, 1/31/11 Amendment at 10.  Sophos is then correct to

include in its construction that the claimed "protocol dialog" is a language of commands and responses.

### 4. "portions of…dialog…in which the receiving Mail Transport Agent accepts or declines delivery of the transmitted message" ('913 patent).

| Claim Term | Sophos's Construction | RPost's Construction |
|---|---|---|
| "portions of…dialog…in which the receiving Mail Transport Agent accepts or declines delivery of the transmitted message" | Part of the conversation of commands and responses sufficient to show that the receiving Mail Transport Agent has accepted or declined the transmitted message | Data including a sequence of at least one command and at least one response |

The two asserted claims in the '913 patent require that a server records a "portion" of the transmission dialog and that the recorded portion includes those "portions of the selected one of the SMTP and ESMTP protocol dialog between the server and the recipient in which the receiving Mail Transport Agent accepts or declines delivery of the transmitted message."

Starting with the words of the claims themselves, the patentee teaches that the recorded portion of dialog is the portion in which the transmitted message is "accept[ed]" or "decline[d]" by the "receiving Mail Transport Agent." '913 patent, cl. 1. From this, it is clear that whatever dialog portion is recorded, it must at least be the portion that is sufficient to show whether the transmitted message was accepted or declined. Indeed, there are many parts of the SMTP/ESMTP protocol that are unrelated to acceptance or rejection of an email message. For example, portions of the dialog establishing a connection between the sender and the receiver do not concern whether a message was accepted. *Id.*, 12:59-63. Portions of the dialog relating to whether a particular recipient is a valid recipient also differs from information about whether a message was accepted. *Id.* Therefore, the "portions of … dialog" claimed in the '913 patent must be the portions that are sufficient to show that the message was accepted or declined.

Moreover, the "dialog" referenced by the '913 patent claims should be understood with reference to the patentee's understanding of the term in the context of message transmission: "[a] dialog, as that term is understood by one skilled in the relevant art, is a list of commands and responses exchanged between an outgoing server and a destination address or server to transmit a message."  Ex. 1, '372 Patent File History, 1/31/11 Amendment at 10.  Sophos's construction is therefore correct.

### B.   The "First Information" Terms ('389 and '199 Patents).

| Claim Term | Sophos's Construction | RPost's Construction |
|---|---|---|
| "first information" | A non-forgeable record of the message recipient(s), the message content, and the time(s) and route(s) of delivery. | No construction necessary |

The '389 and the '199 patents each claim a type of message delivery receipt—called a "first information"—for different types of message events.  Because the patentee coined this term, its proper meaning will come from the patentee's usage in the intrinsic evidence.

The term "first information" does not have a commonly accepted meaning to a person of ordinary skill in the art.  Klensin Decl., ¶ 77.  Rather, the patentee used it to describe a delivery receipt that is created and then sent back to inform the message sender about delivery status.  Therefore, construction is required to ascribe a meaning consistent with the intrinsic evidence. *Phillips*, 415 F.3d at 1314, 1316 (where an inventor acts as his own lexicographer and defines a claim term, "the inventor's lexicography governs").

According to its claims, the "first information" of the '389 patent is a receipt containing a message delivery success notification.  '389 patent, cls. 1, 7, 14 (indicating "receipt of the message by the recipient").  According to its claims, the "first information" of the '199 patent is a receipt containing a message delivery failure notification.  '199 patent, cl. 1 (indicating "failure

to deliver the message to the recipient").  In the specification (which is the same for both the '389 and '199 patents), the patentee explains further what he understands delivery receipts to be. Indeed, just as the claimed system sends a "first information" to the message sender (*e.g.*, '389 patent, cl. 1; '199 patent, cl. 1), "[d]elivery receipts are e-mails sent to the original sender ... ." '389 patent, 14:56-57.  Just as a "first information" includes a notification of the message delivery status ('389 patent, cl. 1; '199 patent, cl. 1), so too does a delivery receipt.  '389 patent, 15:4-18.  Ultimately, though, the patentee explains that a delivery "receipt includes a non-forgeable record of the message recipient(s), the message content, and the time(s) and route(s) of delivery."  '389 patent, 15:44-46.  This communicates the patentee's intended meaning of the term and is consistent with the stated purpose of the claimed invention, which "relates generally to a system and method for verifying delivery and content of an electronic message and, more particularly, to a system and method of later providing proof regarding the delivery and content of an e-mail message."  '389 patent, 1:20-24; *Phillips*, 415 F.3d at 1316.

### C.   "transmitting…the first information to the sender" ('389 patent).

| Claim Term | Sophos's Construction | RPost's Construction |
|---|---|---|
| "transmitting…a copy of the message and the first information to the sender" | Emailing a copy of the message and the first information to the sender. | No construction necessary |

Claim 1 of the '389 patent recites "transmitting … the first information to the sender." '389 patent, cl. 1.  The intrinsic evidence makes clear that the transmission of the first information is by sending an email, and not through another type of transmission (*i.e.*, by displaying the first information on a webpage).

First, the claims require that the "first information" be transmitted in a form that the claimed system can use.  Indeed, the "first information" is used in the claimed systems to authenticate the message at some later point in time because the transmitting has to occur "before any authentication of the message."  '389 patent, cl. 1; *see also e.g.*, '389 patent, 17:6-12 (explaining that a receipt is emailed to a "predefined mailbox" to "prove that a particular message was sent from sender 10 to recipient 18").

The specification provides further evidence that the patentee understood "transmitting" the first information to require emailing.  Indeed, "[d]elivery receipts are e-mails sent to the original sender of the Registered message."  '389 patent, 14:56-57; *see also id.*, Fig. 2E; 21:63-65 ("In step 281, the receipt 20, now being complete, may be sent by e-mail to the sender with the advice that it be kept for the sender's records"); 23:48-50 ("Receipts generated by the RPost server are returned to a web based mailbox associated with the subscriber's account").  In the format of emails, the specification explains how the system can later use or reference the receipt information.  '389 patent, 17:6-12.

The prosecution history further shows that the claimed transmission is by email.  When asked to "show support for" the "transmitting … the first information to the sender" limitation during an examiner-initiated interview, the patentee specifically "provided figure 2E."  Ex. 3, '389 Patent File History, 3/7/12 Examiner-Initiated Interview Summary.  Thus, the patentee specifically linked figure 2E—which shows that "[t]he system generates an email receipt"—with the at-issue claim limitation to preserve the validity of the claim.  *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985) (prosecution history limits interpretation of the claims "so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance").  Thus, the claims, specification and

prosecution history all support Sophos's construction that the "transmitting" of the "first information" claimed in the '389 patent means "emailing."

**D.      "first route" / "second route different from the first route" ('628 patent).**

| Claim Term | Sophos's Construction | RPost's Construction |
|---|---|---|
| "first route" | a path taken by a message from a sender's mail transfer agent to a recipient's mail transfer agent via a network that does not include an intermediate relay through a mail transfer agent at a different network address | No construction necessary |
| "second route different from the first route" | a path taken by a message from a sender's mail transfer agent to a recipient's mail transfer agent via a network that includes an intermediate relay through a mail transfer agent at a different network location | No construction necessary |

Each of the asserted claims of the '628 patent requires transmission of a message through a "first route" if that message lacks a particular indication. '628 patent, cls. 1, 14, 30. Claim 2 further requires transmission of a message through a "second route different from the first route" if the message has a particular indication. *Id.*, cl. 2. Because these terms are not terms of art with known meanings to persons of ordinary skill, construction is required to give these terms the meaning that the patentee has given them. Klensin Decl., ¶ 78; *Phillips*, 415 F.3d at 1314. Sophos's constructions provide this meaning based on the intrinsic evidence.

**1.      The Claims Define "First Route" and "Second Route" As Different Network Paths.**

The '628 patent claims make clear that the claimed "first route" and "second route" are different network paths that process messages differently. According to claim 1, the message is transmitted through a "first" route "if the message lacks the particular indication." '628 patent,

cl. 1.  According to claim 2, if the message has the particular indication, it is "process[ed]…by the server in accordance with the particular indication," which includes "transmitting the message to the recipient through a second route different from the first route."  *Id.*, cl. 2; *see also id.*, cl. 16 ("charging the sender a fee for transmitting the message through the second route").  Because the claimed second route needs to allow the processing of the particular indication— which is not necessary for messages transmitted through the first route—the second route must be a different network path as compared to the first route.  Thus, the claims support Sophos's constructions.

### 2.   The Other Intrinsic Evidence Confirms That These "Route[s]" Are Different Network Paths.

The specification also confirms Sophos's constructions.  Figure 3 of the '628 patent offers the best explanation of the patentee's definition of "first route" and "second route different from the first route."  *Id.*, Fig. 3.  According that figure, if messages do <u>not</u> have an "'(R)' in subject" (meaning they do not have a particular indication), they are transmitted from the Message Sender 10 and the "Sender's MTA" through a network route without intermediate relay to the "Recipient's Mail Transport Agent (RPost Server)" 16.  *Id.*  This is the claimed "first route" used for messages without a particular indication.  Conversely, if messages have an "'(R)' in subject," they are transmitted from the Message Sender 10 and the "Sender's MTA" through a different network route to a separate "Registering Mail Transport Agent (RPost Server)" 14 before transmission to the "Recipient's Mail Transport Agent (RPost Server)" 16.  *Id.*  According to Figure 3, transmission of messages through this second route includes transmission of "ESMTP Dialog" and "MTA DSN Report(s) & MUA Notifications."  *Id.*  This further demonstrates that the patentee intended the claimed second route to be a different network path as compared to the claimed first route, with different processing.

The file history also supports Sophos's proposed constructions.  In an office action response during prosecution of the '628 patent, the patentee stated that the network path through which a message is transmitted depends on the claimed particular indication:  "[e]ven if combined with Liu as suggested by the Examiner, one skilled in the art would still not obtain Applicant's invention which requires the server remote from the recipient to make a determination concerning which route to send a message based upon an indication in the message."  Ex. 4, '628 Patent File History, 7/20/11 Response at p. 8.

Similarly, one of the provisional applications to which the '628 patent claims the benefit, No. 60/172,479, shows that the patentee understood the word "route" to be a network path between servers:  "Email is ordinarily passed from mail server to mail server on route to its destination.  But it is possible for any mail SMTP server to call any other server.  The system uses this method to control the routing of its outbound messages."  Ex. 5, U.S. Application No. 60/172,479 at p. 8.  Thus, the prosecution history confirms that the claimed routes are different network paths between servers with different processing requirements.

### E.        "Mail Transport Agent" ('913 patent).

| Claim Term | Sophos's Construction | RPost's Construction |
|---|---|---|
| "Mail Transport Agent" | a program executing on a computer that routes electronic mail messages along a network path from the sender to a recipient | No construction necessary |

Each of the asserted claims of the '913 patent recites a "server acting as a Mail Transport Agent," which receives the email message transmitted according to either SMTP or ESMTP protocol dialog.  *See* '913 patent, cls. 1, 10.  Sophos's proposed construction is consistent with the intrinsic evidence and represents what the patentee understood as the ordinary meaning.

Starting with the claims, a "Mail Transport Agent" is clearly an agent that routes mail. Claim 1 also recites that an email is transmitted "from a sender to a recipient through a server acting as a Mail Transport Agent."  *Id.*, cl. 1.  This language confirms that such an agent is a program executing on a computer because it is described by the claim as a "server."  Moreover, the claims require that the message be transmitted by either the SMTP or ESMTP protocol dialogs.  *See id.*  SMTP and ESMTP are protocols specifically used to transmit email messages. *See id.*, 26:60-65 ("SMTP is a protocol for sending e-mail messages between servers."); *see also id.*, 8:31-53, 11:18-23, 11:41-48, 11:63-12:65, 15:16-18, 24:60-25:12, 26:66-27:2.  Thus, the Mail Transport Agent must be one that relates to email messages.

The '913 patent specification further teaches that a "Mail Transport Agent" is an agent that routes email along a network path from sender to recipient.  Indeed, the patent explains that

> FIG. 1 is a system diagram of a first embodiment of the present
> invention, wherein outgoing e-mails are registered according to the
> present invention.  In this embodiment, the RPost registering
> server 14 serves as the primary outgoing Mail Transport Agent
> (MTA) for a message sender's Mail User Agent (MUA) 13.

*Id.*, 6:38-43.  The patent also explains that "[i]t is common practice for Internet e-mails to be relayed from MTA to MTA until they reach their destination."  *Id.*, 11:41-42.  And the patent states that "[s]ince mail servers receive messages via SMTP, e-mail readers send e-mail to a mail server using SMPT."  *Id.*, 27:2-4.  Thus, the claimed "mail transport agent" is a program executing on a computer that routes electronic mail messages along a network path from the sender to a recipient.

## VI.    CONCLUSION

For the foregoing reasons, to the extent the Court reaches claim construction at all, Sophos respectfully requests that the Court find that each of the asserted claims of the '628

patent is invalid as indefinite, and that the Court adopt Sophos's proposed constructions of the

remaining terms.

Dated: December 22, 2015                    Respectfully submitted,


                                            /s/ Nicholas G. Papastavros

                                            Nicholas G. Papastavros, BBO # 635742
                                            Maya P. Choksi, BBO # 679861
                                            DLA Piper LLP (US)
**OF COUNSEL:**                             33 Arch Street, 26th Floor
                                            Boston, MA 02110-1447
Sean Cunningham (*pro hac vice*)            (617) 406-6000 (*telephone*)
Kathryn Riley Grasso (*pro hac vice*)       (617) 406-6100 (*facsimile*)
DLA PIPER LLP (US)                          nick.papastavros@dlapiper.com
401 B Street, Suite 1700                    maya.choksi@dlapiper.com
San Diego, CA  92101
(619) 699-2700 (*telephone*)                **ATTORNEYS FOR SOPHOS INC.**
(619) 699-2701 (*facsimile*)
sean.cunningham@dlapiper.com
kathryn.riley@dlapiper.com

Todd S. Patterson (*pro hac vice*)
DLA PIPER LLP (US)
401 Congress Avenue, Suite 2500
Austin, Texas 78701-3799
(512) 457-7000 (*telephone*)
(512) 457-7001 (*facsimile*)
todd.patterson@dlapiper.com

Andrew N. Stein (*pro hac vice*)
DLA PIPER LLP (US)
500 Eighth Street, NW
Washington, D.C.  20004
(202) 799-4000 (*telephone*)
(202) 799-5000 (*facsimile*)
andrew.stein@dlapiper.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this 22nd day of December, 2015, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document through the Court's CM/ECF system under Local Rule 5.4(C).  Any other counsel of record will be served by a facsimile transmission and/or first class mail.

<u>/s/ <i>Nicholas G. Papastavros</i></u>
Nicholas G. Papastavros
